1

**GOOD GUSTAFSON AUMAIS LLP**
2
Christopher T. Aumais (Cal. Bar No. 249901)
2330 Westwood Blvd., No. 103
3
Los Angeles, CA 90064
Tel: (310) 274-4663
4
cta@ggallp.com

5
**THE SMITH LAW FIRM, PLLC**
R. ALLEN SMITH, Esq.*
6
300 Concourse Blvd., Suite 104
Ridgeland, MS 39157
7
Tel: (601) 952-1422
asmith@smith-law.org
8

9
**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
10
100 S Commons, Ste 102
Pittsburgh PA 15212
11
Tel: (888) 412-5291
stkeeton@keetonfirm.com
12

13
*Pro hac vice* forthcoming

14
*Counsel for Plaintiffs and the Proposed Class*

15

16
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
17

18

19
| Jenny Houtchens and Samantha Ramirez, individually, and on behalf of those similarly situated, | CASE NO. |
20
| | **CLASS ACTION COMPLAINT** |
21
| Plaintiffs, | **Demand for Jury Trial** |
22
| v. | |
23
| Google LLC, | |
24
| Defendant. | |

25

26

27

28

Plaintiffs Jenny Houtchens and Samantha Ramirez ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Defendant Google LLC ("Google" or "Defendant") for the manufacture, distribution, and sale of the Fitbit smartwatch (the "Product" or "Products").[1] Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which is based on personal knowledge:

## NATURE OF ACTION

"Don't be evil."
. . .

"And remember... don't be evil, and if you see something
that you think isn't right – speak up!"

*Google*[2]

1.      This is a class action complaint against Defendant for the manufacture, distribution, marketing, and sale of the Products, all of which suffer from an identical defect in design. Specifically, the Products are prone to burning users during use and create the potential for a burn or fire hazard. Smartwatches that pose such a hazard are unreasonably dangerous compared to the utility of the Product. Moreover, such a defect can render the Products unusable during periods of overheating. As such, this defect rendered the Products unsuitable for its principal and intended purpose.

---

[1] At the time of this filing, the following Fitbit products are included in this definition: Versa, Versa 2, Versa 3, Charge 4, Versa Light, Ionic, Sense, Alta HR, Inspire, Inspire HR, Inspire 2, and Blaze. This definition is not exhaustive, and shall include all of Defendant's products that are similarly defective.

[2] Archived version of previous version of Google Code of Conduct, https://web.archive.org/web/20180421105327/https://abc.xyz/investor/other/google-code-of-conduct.html *and* Google Code of Conduct, https://abc.xyz/investor/other/google-code-of-conduct/.

GOOD GUSTAFSON AUMAIS LLP

Further, had Plaintiffs been aware of this serious defect, they would not have purchased the Product, or would have paid significantly less for it.

2.      On March 2, 2022, Defendant in conjunction with the United States Consumer Product Safety Commission ("CPSC") announced a voluntary recall of approximately 1,700,000 units of Defendant's Fitbit Ionic smartwatch due to the prevalent nature of the defect (the "Ionic Recall").[3]

3.      While one of the Products - the Fitbit Ionic smartwatch – was recalled, the same defect exists throughout all of the Products.

4.      In fact, the defect has been present in all of the Products for years.

5.      Defendant fails to acknowledge this, and instead places the blame on one "bad apple" to avoid liability and diminished sales for the "whole bunch."

6.      Unfortunately, the defect permeated – unknowingly to consumers – throughout all of the Products which led (and currently leads) to unneeded physical injury and economic harm.

7.      When consumers contact Fitbit about the safety risk, the company attempts to "wash away" the harm it caused by shifting the blame to consumer hygiene rather than focusing on the true culprit: the company's defective Products.

8.      Because Defendant continues to reap its spoils, and gives the false impression that the Products are safe, Defendant exposes this risk to millions of Americans every day while also knowingly selling consumers defective Products that are worth less than represented.

---

[3] Allen St. John, *Fitbit Recalls 1.7 Million Ionic Smartwatches Due to Burn Hazard*, CONSUMER REPORTS (Mar. 2, 2022), https://www.consumerreports.org/smartwatch/Fitbit-recalls-ionic-smartwatches-due-to-burn-hazard-a1122765473/.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

9.      In fact, once the truth is exposed the devices are worthless to most consumers. In many instances, they are thrown away or stored in a closet.

10.      Reasonable consumers, like Plaintiffs, purchase the Products to burn calories – not their skin  – and to safely pursue a healthy lifestyle with the aid of a smartwatch.

11.      Additionally, Defendant's failure to admit that the defect impacts all of the Products – rather than just the Ionic – exposes millions of airline passengers every day to undue risk because the FAA prohibits passengers from traveling with damaged or recalled batteries.[4]

12.      Moreover, Google's "recall" of the Fitbit Ionic fails to fully compensate the owners of the Ionic. It is a mere facade to show that Defendant is "doing the right thing," but in fact, the recall merely protects Defendant's profits by suppressing refunds by using methods and techniques that make it difficult for consumers to receive compensation for their defective watches. As one consumer summarized:



Hamid Reza Sanei @Hamid1986Reza · Apr 12
@fitbit is a fraud, they take your iconic due to a **recall** but they won't reimburse you for weeks after they receive the device. @FitbitSupport a class action law suit is needed for change of behavior.

13.      Plaintiffs bring their claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Product for (i) violations of the consumer protection statutes for states included in a Multi-State Consumer Class; (ii) violations of California's Unfair Competition Law; (iii) violation of California's False Advertising Law; (iv) violation of California's Consumer Legal

---

[4] FEDERAL AVIATION ADMINISTRATION, *PackSafe for Passengers*, https://www.faa.gov/hazmat/packsafe/#damaged.

GOOD GUSTAFSON AUMAIS LLP

Remedies Act; (v) violation of Pennsylvania's Unfair Trade and Consumer Protection Law; (vi) breach of implied warranty; (vii) violation of the Magnuson-Moss Warranty Act; and (viii) unjust enrichment.

## PARTIES

14.    Plaintiff Jenny Houtchens is, and at all times relevant to this action has been, a resident of Pennsylvania and a domiciliary of Pennsylvania. On or about December of 2020, Ms. Houtchens purchased a Fitbit Versa Light smartwatch from Amazon.com which was shipped to her home in Monroe County, Pennsylvania. Ms. Houtchens purchased the Product because she believed it was fit for use as a smartwatch for her teenage daughter. However, the Product that Ms. Houtchens purchased was not fit for use as a smartwatch due to the Product's risk of overheating and burning users. Ms. Houtchens' belief that the smartwatch was fit for its intended purpose formed the basis of the bargain, and Ms. Houtchens would not have purchased the Product or would have paid significantly less for the Product had she known that the Product was unfit to perform its intended purpose.

15.    Plaintiff Samantha Ramirez is, and at all times relevant to this action has been, a resident of California and a domiciliary of California. On or about November of 2021, Plaintiff purchased a Fitbit Versa 2 smartwatch from a Walmart store located in Stockton, California. Ms. Ramirez purchased the Product because she believed it was fit for use as a smartwatch. However, the Product that Ms. Ramirez purchased was not fit for use as a smartwatch due to the Product's risk of overheating. Ms. Ramirez's belief that the smartwatch was fit for its intended purpose formed the basis of the bargain, and Ms. Ramirez would not have purchased

the Product or would have paid significantly less for the Product had she known that the Product was unfit to perform its intended purpose.

16.     The Products that Plaintiffs purchased began to malfunction shortly after purchase because the Product would overheat during use which caused burning of the wrist for Ms. Ramirez and the daughter of Ms. Houtchens.

17.     Plaintiffs suffered economic injury from the Products' defect because they purchased an item that was worth less than what had been represented to them.

18.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. From its California headquarters, Defendant produces, markets and distributes its Products in retail stores across the United States including stores physically located in the State of California and within this district. The engineering, marketing, sales, and recall decisions described herein were made from its offices located within the State of California.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

20.     This Court has general personal jurisdiction over Defendant because Defendant has its principal place of business in this District.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is a judicial District in which Defendant resides.

**DIVISIONAL ASSIGNMENT**

22.     Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in Santa Clara County, and this action should be assigned to the San Jose Division.

**COMMON FACTUAL ALLEGATIONS**

**A.     Defendant Manufactures, Markets, Distributes and Sells the Products**

23.     Defendant manufactures, markets, distributes, and sells Fitbit smartwatches throughout the United States.

24.     On October 31, 2019, Defendant announced that it was going to acquire Fitbit for $2.1 Billion.[5]

25.     In January 2021, Defendant completed the acquisition of Fitbit.[6]

---

[5] Daisuke Wakabayashi and Adam Satariano, *Google to Buy Fitbit for $2.1 Billion*, THE NEW YORK TIMES (Nov. 1, 2019), https://www.nytimes.com/2019/11/01/technology/google-fitbit.html.

[6] Alphabet Inc. Form 10-K for 2021, at 74 https://abc.xyz/investor/static/pdf/20220202_alphabet_10K.pdf?cache=fc81690 (filed Feb. 1, 2022).

GOOD GUSTAFSON AUMAIS LLP

26.     When Google acquired Fitbit, it claimed that the deal was "about devices, not data,"[7] but that has not been the case.

27.     While Google offers millions of dollars in bounties to solve software vulnerabilities,[8] it offers no bounty for the critical defect that has plagued the Products for years.

28.     Despite its "expertise in engineering"[9] and knowledge of this defect, Defendant continues to manufacture, distribute, and sell faulty smartwatches as part of its "family of helpful devices."[10]

**B.     The Product Defect**

29.     The Products are made with a design defect that causes the Products to overheat and poses a significant hazard for burns and fires (hereinafter, the "Product Defect" or "Defect").

30.     The Product Defect was substantially likely to materialize during the useful life of the Product.

31.     Moreover, for many users, the Defect occurs within months of initial use.

32.     The Defect involves the battery and charging system of the Products.

33.     Millions of units containing this Defect were sold throughout the United States to consumers in all fifty states and Washington, D.C. at a purchase price ranging from approximately $100 to $350 per unit.

34.     The Defect at issue here involves a critical safety-related component of the Products, and it is unsafe to use the Product with the design defect.

35.     Defendant has knowledge of the defect, which was not known by Plaintiffs or Class Members prior to purchase.

---

[7] Rick Osterloh, *Google completes Fitbit acquisition*, THE KEYWORD (Jan. 14, 2021), https://blog.google/products/devices-services/Fitbit-acquisition/.

[8] Liam Tung, *Google increases its bug bounty for Fitbit and Nest security flaw*, ZDNet (April 6, 2022), https://www.zdnet.com/article/google-increases-its-bug-bounty-for-Fitbit-and-nest-security-flaws/.

[9] Alphabet Inc. Form 10-K 2021, *supra* note 6 at 29.

[10] *Id.* at pg. 2.

GOOD GUSTAFSON AUMAIS LLP

36.    Prior to the March 2022 Recall of the Fitbit Ionic, Defendant has never admitted that the Defect existed.

37.    Rather, when consumers presented their devices to Defendant that were impacted by the Defect, Defendant would refuse to replace, refuse to admit the Defect existed, claim that the device was no longer covered by the warranty, and often try to sell them a new device.

38.    For example:



GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    39.    Moreover, when consumers try to raise these issues and concerns on the

17  official Fitbit forum, Defendant's agents and employees actively remove posts:

18
19
20
21
22
23

I feel they are betting on us owners doing this years ago. For a couple of people have mentioned reaching out to lawyers about this on their forums and their moderation team is still removing posts like that. There's one reason that I'm no longer a Fitbit customer and that's because of their moderation team deleting posts about these devices catching on fire and any talk about legal action.

24    40.    Defendant made partial representations to Plaintiffs and Class

25  Members, while suppressing the safety defect. Specifically, by displaying the Product

26  and describing its features, the product packaging implied that the Product was

27  suitable for use as a smartwatch, without disclosing that it had a critical safety-

28  related defect that could result in harm to users of each Product.

41.    Additionally, Defendant fails to inform consumers that the Defect is present in all of the Products – not just the recently recalled Ionic model.

42.    Consumers expected the Products to give them enhancements to their health, not injuries that can take multiple weeks to heal:



**C.    The Defect is Present in all of the Products.**

43.    The Defect is not limited to the Ionic model.

44.    Rather, it is present in all of the Products.

45.    For years, there has been a consistent denial of the Defect's presence in the Products which has only led to greater danger to the public. For example, one Fitbit Sense user was harmed when the battery overheated and exploded:





CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

46.     At a minimum, the Fitbit Versa 2, Fitbit Versa, Fitbit Charge 4, Fitbit Versa Light, Fitbit Ionic, Fitbit Sense, Fitbit Alta HR, Fitbit Inspire, Fitbit Inspire HR, and Fitbit Blaze all have the same Defect.

47.     Yet, Defendant only claims the Defect exists in the Fitbit Ionic.

48.     When consumers describe the Defect in other models, Defendant denies its presence in the non-Ionic devices:



49.     Numerous reports and consumer experience prove otherwise:

**a.**     Fitbit Inspire HR:[11]



Incident Details

Incident Description: I received the product as a gift - and what a terrible gift to receive. After three weeks of use, I now have a burn the size of the back of the Fitbit on my wrist, which is now starting to peel and looks like it might leave a scar. The Fitbit remained clean, I did not sweat, and there are way TOO MANY reports on these products for Fitbit to continue to make excuses for a proven and consistent design flaw. A simple [REDACTED] search demonstrates that this burn / rash reaction quite clearly has been caused by several of various Fitbit models and injured way too many people. I am so disappointed with this company. It is absolutely beyond my comprehension how / why Fitbit is allowed to continue to market a product that has harmed countless end users. Shame on you, Fitbit.

Incident Date: 4/20/2020

Incident Location: Home/Apartment/Condominium

---

[11] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20200428-BC67C-2147372667 (April 28, 2020), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1975780.

**b.** Fitbit Charge 4:[12]

Incident Details

Incident Description: Wearing a Fitbit after charging it on a warm day left a burn mark on my wrist.

Incident Date: 7/30/2021

Incident Location: Home/Apartment/Condominium

**c.** Fitbit Versa Light:[13]

Incident Details

Incident Description: I have a fit bit Versa Lite I have had the product for about 6 months and It has caused burns on my wrist When I called the company they told

Incident Date: 8/5/2020

Incident Location: Home/Apartment/Condominium

**d.** Fitbit Alta HR:[14]

Incident Details

Incident Description: I purchased my FitBit Alta HR on January 5, 2018, from Amazon.com . After purchase, I wore it day and night, continuously. I have purchased several apps that interface with the FitBit specifically. However, just now, from May 2020 until today, the device has started burning my wrists. Because of this, I have been taking the device off at night, and switching wrists regularly. However, the burns continue to be a problem, and they take some time to heal. I have not gone to a doctor, because the burns do eventually heal with at-home care. The problem is not with the wrist band, I have cleaned the band, and replaced the band several times in case that was the issue, and it does not seem to be. One of the contacts on the charging dongle, and one on the FitBit-side charging port seem to be corroded, and I believe this may be the trouble. I understand that I am out of warranty. I attempted to contact FitBit support with the email they provided to other reports on this site, but they have disabled their email customer support.

Incident Date: 5/18/2020

Incident Location: Home/Apartment/Condominium

**e.** Fitbit Versa:



[12] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20210730-38966-2147361482 (July 30, 2021), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3397669.

[13] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20210115-27871-2147366491 (Jan. 15, 2021), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=2979994.

[14] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20201229-D5EA8-2147367102 (Dec. 29, 2020), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=2951667.

GOOD GUSTAFSON AUMAIS LLP

f.    Fitbit Sense:

**Fitbit burned me. Physically. Now they're just draining my time. Halp.**

I was super excited to use my Fitbit Sense until the burns started. Then it was just pain. I didn't know this was a thing that could happen.

I reached out to support and they responded well, sending me a return label and saying they needed a copy of the receipt. So I sent them it and the device complete in box. You'd think the story would end there, right?

Nope. It has been months. I keep messaging them, and I've called, and since the FedEx package hasn't gotten there I've received no refund. and This is just getting frustrating and figured at least here I could vent.

I attached a photo of the burn (with Pikachu for reasons), just to show people that it can happen. I really hope it happens to none of you.

Are burns common?How do I get my refund?

g.    Fitbit Versa 2:

**Fitbit Versus 2 burning**

I am seeing lots of post about this but can't seem to find out what to do about it.

My mother-law was wearing her fit bit and it really started to hurt her wrist. When she took off the Fitbit she has what looks like a chemical burn on her wrist. It's extremely painful and looks terrible.

She is on going to be heading to the doctor shortly.

Any advice or direction would be greatly appreciated!

Thanks

Edit: I don't think getting a replacement is an acceptable answer. Perhaps that is all that is out there.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

**h.**    Fitbit Versa 3:



**i.**    Fitbit Blaze:

Blaze burned my wrist and Fitbit support has gone silent. Has this happened to anyone?

Last sunday I removed my Fitbit Blaze to charge it and noticed a burn scar where the sensor touches the skin. I've had this Blaze for two years now and never had any skin issues or anything like this. I stopped wearing it and emailed Fitbit support that night with some pictures. They replied two days later saying they would get in touch soon. This was 5 days ago.

I'm not really sure what to do. I haven't put it back on but it sucks cause I miss using it for my workouts and specially for my alarms as I absolutely loathe alarms with sound.

Anyone have this problem before? It's been a week now and the scar is starting to fade but it's still very visible and flaky (doesn't hurt though).

Some pics: https://imgur.com/a/WVfQlpb

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**j.**     Fitbit Inspire:



**Fitbit Inspire leaving a burn mark.**

Hi, just a quick question as I am having no joy with Fitbit's customer service.

But has anyone had issues with their fitbit leaving a burn mark on their wrist and had dealings with customer service about this?

I have the Inspire and I have had it for nearly a year with no issues at all. It is cleaned properly and I always take it off after exercise to stop any sweat causing problems with the device or strap.

My case has apparently been escalated but I am still yet to hear anything. I dont wanna give it up as it has really helped me lose weight and keep active over the last few months, but after a few days it became very irritating so had no choice. I have thought about putting a plaster under the device to stop skin contact but I'm worried there is something wrong with it.

**k.**     Fitbit Inspire 2:



**Incident Details**

Incident Description: My Fitbit Inspire 2 overheated while I was wearing it indoors in my air conditioned home. I noticed my wrist becoming red and irritated. I was unsure what would be causing it as I've had my watch for nearly a year. Then, I noticed my watch screen appeared as though there was moisture inside it and it was no longer functional (the screen wouldn't turn on). Once I took off the watch I noticed that the watch itself was very hot to touch. No long-term injuries occurred that required medical attention, but my skin has continued to have a burning sensation since the incident at 1:45pm Pacific time. My skin was red for about 30-60 minutes after the incident. It seems the battery overheated or somehow battery fluid was released into the watch internally.

Incident Date: 3/30/2022

Incident Location: Home/Apartment/Condominium

50.     Defendant's failure to admit that the Defect is present in all of the Products continues to not also endanger consumers but also leave consumers with Products that are worthless due to the presence of the Defect.

51.     For example, children are at risk from these Products, and parents are now stuck with smartwatches that have no value to them nor do they want to sell them to another person that could be harmed. Instead, they are either thrown away or stashed in a closet. The harm is real, and as one mother pleads for Google to admit the Defect's presence, correct its behavior, and compensate for the harm it caused and continues to cause:



52. Google's denial creates undue risk, danger, and harm throughout all aspects of everyday life. This danger is ever-present. Thus the Defect removes all utility from the Products.

**D.    The Fitbit Ionic Recall**

53. The Fitbit Ionic was launched in August 2017 as the company's flagship product.[15]

54. Despite Fitbit's investment and marketing efforts – including the use of celebrity spokespeople like Harrison Barnes – the Ionic failed to hit the company's targets and failed to perform in the marketplace.[16]

55. As Fitbit co-founder James Park described:[17]

---

[15] FITBIT, *Fitbit Launches Ionic, the Ultimate Health and Fitness Smartwatch* (Aug. 28, 2017), https://investor.Fitbit.com/press-releases/press-release-details/2017/Fitbit-Launches-Ionic-the-Ultimate-Health-and-Fitness-Smartwatch/default.aspx.

[16] *Id.*

[17] Jason Cipriani, *Q&A: Fitbit CEO James Park talks about the company's past, present, and future*, ZDNet (April 16, 2018), https://www.zdnet.com/article/q-a-Fitbit-ceo-james-park-talks-about-the-companys-past-present-and-future/.

1    ZDNet: Why do you think Ionic didn't do as well as you had hoped?

2    Park: I think it really wasn't appealing to the mass audience. It's a

3    performance-oriented watch with a lot of features from GPS to the

4    introduction of new sensors, along with the form factor which is

5    more performance orientated.

6    56.    In other words, it was "a disappointment."[18]

7    57.    Before the first anniversary of its launch, it was already being outsold by

8    Fitbit's other smartwatches.[19]

9    58.    In 2020, production of the Fitbit Ionic stopped.[20]

10    59.    The once "strongest and lightest GPS watch"[21] that represented Fitbit's

11    "most advanced design"[22] had diminished so far in value to the company, that it failed

12    to be merit a mention in Fitbit's Third Quarter Earnings Press Release published in

13    November 2020.[23]

14    60.    When Google's acquisition of Fitbit was finalized in January 2021, the

15    announcement by Google's Senior VP of Devices & Services mentions numerous Fitbit

16    models but fails to name the Ionic.[24]

17    61.    In December 2021, Defendant stopped selling the Fitbit Ionic.[25]

---

[18] Todd Haselton, *The latest Fitbit can't match up to the Apple Watch*, CNBC (Oct. 1, 2017), https://www.cnbc.com/2017/09/29/fitbit-ionic-review-not-as-good-as-an-apple-watch.html.

[19] Aaron Pressman, *Fitbit Finally Has Another Hit on Its Customers' Wrists*, FORTUNE (June 4, 2018), https://fortune.com/2018/06/04/Fitbit-versa-one-million/.

[20] U.S. Consumer Product Safety Commission, *Fitbit Recalls Ionic Smartwatches Due to Burn Hazard; One Million Sold in the U.S.* (March 2, 2022), https://www.cpsc.gov/Recalls/2022/Fitbit-Recalls-Ionic-Smartwatches-Due-to-Burn-Hazard-One-Million-Sold-in-the-U-S.

[21] Fitbit, *supra* note 15.

[22] *Id.*

[23] Fitbit, *Fitbit Reports Third Quarter Results for the Three Months Ended October 3, 2020* (Nov. 4, 2020), https://investor.Fitbit.com/press-releases/press-release-details/2020/Fitbit-Reports-Third-Quarter-Results-for-the-Three-Months-Ended-October-3-2020/default.aspx.

[24] Osterloh, *supra* note 7.

[25] U.S. Consumer Product Safety Commission, *supra* note 20.

GOOD GUSTAFSON AUMAIS LLP

62.    In March 2022, Defendant announced a recall of the long discontinued Fitbit Ionic.[26]

63.    The Fitbit Ionic recall covered over 1,000,000 defective units in the United States.[27]

64.    Planned since 2019,[28] the long-developed Fitbit Ionic 2 is anticipated to launch in 2022.[29]

**E.    Defendant's Recall Is Inadequate**

65.    While the Defect exists – and has existed for many years – throughout all of the Products, the Defendant's feigned recall attempt focuses solely on the Fitbit Ionic – a device that hasn't been produced since 2020 and hasn't been sold since 2021.

66.    In other words, rather than fixing the defect, telling the truth to consumers, and protecting consumers that trusted in the company, Google merely places the blame on a long deactivated device.

67.    Further, this feigned recall "conveniently" aligns with the expected launch of the Fitbit Ionic 2 – the Ionic's replacement that has been in development since at least 2019.

68.    In this "recall," the Defendant finally admitted that the Ionic contains the Defect – something that has long been denied by Defendant.

69.    However, Defendant fails to admit that the Defect exists throughout all of the Products.

70.    In fact, it denies it: "These incidents are very rare and this voluntary recall does not impact other Fitbit smartwatches or trackers."[30]

---

[26] *Id.*

[27] *Id.*

[28] Hugh Langley, *Fitbit Ionic 2 is happening*, WAREABLE (Mar. 6, 2019), https://www.wareable.com/Fitbit/Fitbit-ionic-2-release-date-price-specs-7047.

[29] James Rogerson, *Fitbit Ionic 2: here's everything we know so far*, TECHRADAR (Jan. 24, 2022), https://www.techradar.com/news/Fitbit-ionic-2.

[30] Sam Whiting, *This Fitbit watch is getting recalled because its battery can overheat and cause serious burns*, SAN FRANCISCO CHRONICLE (Mar. 2, 2022), https://www.sfchronicle.com/bayarea/article/This-Fitbit-watch-is-getting-recalled-because-its-16969666.php.

GOOD GUSTAFSON AUMAIS LLP

71.     These denials expose millions of American passengers to potentially dangerous outcomes that fly each day.

72.     The FAA prohibits passengers from traveling with damaged or recalled batteries.[31]



73.     While passengers might be informed that their Ionic is defective, they are oblivious that the other Products suffer the Defect.

74.     As a result, a passenger acting under this belief might wear one of the non-recalled Products, walk through the TSA checkpoint and board the aircraft simply because the Versa 2 on their wrist was not recalled.

75.     The recall of the Fitbit Ionic fails for additional reasons.

76.     The recall was due to a serious injury and safety hazard associated with the Products. Specifically, it was admitted that the Ionic model had a Defect in design and materials that caused the smartwatch to overheat. This resulted in numerous reports of burns and injuries associated with the Defect.

77.     The Fitbit Ionic recall has been inadequate for consumers.

78.     The recall allowed Defendant to say it was doing right by its customers, but in fact the recall protected Defendant's profits by suppressing refunds by using methods and techniques, including but not limited to:

  **a.** Failing to address previous owners that suffered from the Defect yet no longer physically possessed the smartwatch;

---

[31] FEDERAL AVIATION ADMINISTRATION, *supra* note 4.

**b.**   Failing to inform the consumers that the Products they may select as a replacement to the Fitbit Ionic suffer from the same Defect;

**c.**   Representing a "full refund," but hiding the true terms behind barriers;

**d.**   Forcing consumers to use multiple third party platforms - that each have additional, onerous terms and confusing procedures within – as the mechanism to obtain compensation under the recall;

**e.**   Failing to have an adequate infrastructure to conduct the recall;

**f.**   Failing to provide adequate communication options for consumers;

**g.**   Failing to timely deliver the refunded compensation;

**h.**   Failing to respond to legitimate consumer complaints regarding the deficiencies present in the recall;

**i.**   Actively removing consumer complaints about the recall process on its official platforms including but not limited to the forum on its official website;

**j.**   Failing to notify consumers with an adequate recall notice which properly informs consumers of the defect;

**k.**   Providing a recall remedy that was grossly insufficient because it fails to compensate consumers for the purchase of a dangerous and defective product;

**l.**   Failing to fully compensate consumers for accessories, applications, and other Fitbit related products and services that can no longer be used;

**m.**   Failing to fully compensate consumers because the recall remedy did not provide for statutory damages and other relief owed to consumers.

1      79.    The recall's inadequacy is impacting consumers throughout the country:





CLASS ACTION COMPLAINT

1

2

**telmc** @telmckeown · Apr 20                    •••
@FitbitSupport 2nd day trying to contact the **fitbit** ionic **recall** line as you advised, all advisors are still busy, apparently. Please help.

3

4

**Jonathan SC ن Esq.** @jonathansc · Mar 4        •••
Replying to @fitbit and @ihalliwell
You claim it is an issue in the #**Fitbit** **recall** dept - but support are unable to contact that department to find out when it will be resolved

5

6

**Obsidian, MBA.** @rednificent · Apr 9           •••
Has anyone received their refund from @fitbit for the #**recall** of the **Fitbit** #**Ionic** yet? @FitbitSupport it's been over 6 weeks... What's up?

7

8

9

**Mark Fletcher-Robson** @markfr2018 · Apr 19     •••
Replying to @FitbitSupport
Thanks **Fitbit** support, unfortunately I have already contacted the Ionic **recall** line.  Turns out they are **Fitbit** at all, just a centre taking calls and can't offer any help.  Any suggestions that might actually help me ??????

10

11

12

**sayonara** @Ezechiele57 · Mar 17               •••
Replying to @theeldis @verge and 7 others
it is all true what you write I am in your same condition since March 2nd and I add that if you allow yourself to complain on their forum you are BANNED as they did with me

13

14

15

**Damien Smith** @DamienS15267339 · Apr 6        •••
Don't overly use Twitter, however I feel compelled to complain how frustrating it has been trying to gain the refund from the **Fitbit** ionic **recall**. The process has been made next to impossible. Extremely disappointed @**fitbit**

16

17

18

**Jordan Tennis** @JordanTennis1 · 10h           •••
@FitbitSupport I sent back my **Fitbit** ionic almost a month ago for the **recall**. When can I expect my refund? The tracking said it was delivered.

19

20

21

**Naveen V** @naveen_742 · Apr 25                •••
@FitbitSupport  Dear **Fitbit** - Thanks for your proactive **recall** in **Fitbit** Ionic. I have two **Fitbit** Ionic watches and I registered for the refund on 9th Mar and I have not received any update since then. Pls suggest next steps. Thanks!

22

23

24

**YOGESH VARMA** @varmayogesh · Apr 26           •••
@**fitbit**
Am really disappointed with the time it is taking **Fitbit** to refund my ionic **recall** . Has been more than a month since registered. Very bad customer experience 😔

25

26

27

28

GOOD GUSTAFSON AUMAIS LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GOOD GUSTAFSON AUMAIS LLP**

**dimdtlslivai** @BlurredFace27 · Apr 21  ···
Taking matters into my own hands today.
Called the **recall** line and the same shit attitudes.
I'm now talking to a supervisor through **fitbit**. Attempting to get results
#FitbitIonicRefundPending

**PManepally #SaveSoil** @promanepalli · Apr 21  ···
@FitbitSupport  been following up with support team for months now!
Regarding a **fitbit** iconic **recall** issue. The way this issue is handled is
frustrating.

**Damien Smith** @DamienS15267339 · Apr 6  ···
Don't overly use Twitter, however I feel compelled to complain how
frustrating it has been trying to gain the refund from the Fitbit ionic **recall**.
The process has been made next to impossible. Extremely disappointed
@fitbit

**Joy legaljd** @JoyLiveLife · Apr 17  ···
#FitbitIonicRefundPending @fitbit @FitbitSupport NO CUSTOMER
SERVICE! Many people are having the same issue of not getting any
response from @fitbit. Shame on you! Not concerned with the health of
your customers. Why the 3-6week wait AFTER you receive ionic? @Garmin
@SamsungUS



Lyndsay Kotalik @no_poncho · Apr 16  ···
Replying to @lizzyandlee_liz and @FitbitSupport
Hey @fitbit is the **recall** line you or the 'Sedgwick' company?The US rep
today said "6 weeks of business days" and my 3/4 request will be refunded
by 5/2. 6wks is not ever supposed to really be 8.4 🤦

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



This is honestly a slap in the face for all of us users who have had issues like this with our ionics and ended up tossing them in the trash after Fitbit flat-out refused to replace them. These devices are barely lasting a year for a lot of people and their website forum moderation team has outright deleted posts about the overheating and banned a number of users for saying their devices caused them bodily harm and Fitbit denies any responsibility.

I'm glad I still have one of my devices but I tossed the other one that died at 8 months in the trash only a couple of weeks ago when I came back to the office to work after two years. They denied the warranty on that second device even though it barely lasted a year before it overheated and stopped working.

captaincaitlin5   ↑ 1                              •••  1mo

Absolutely! I felt like I was going crazy after getting burned MULTIPLE TIMES and going to the forums to find answers, only for the support team to just answer other concerned users with "oh it's just a rash because you haven't kept it clean," which is kinda insulting.

zerodameaon   ↑ 1   Surge                         •••  1mo

Their current thread about the recall hasn't had a single answer posted by their team, it's dozens of copy and pastes of the original help post.

Someone will reply to one of those asking for more information and not just a copy paste and another mod answers with that exact copy paste.

Edison may have caused me to never be a customer again but their other mods are certainly helping him chase away others.

Jared Allsop ▸ Fitbit
March 16 · 🌐

Jared Allsop
FitBit - I have spent over 12 hours on hold and have talked with over 8 people on your customer service lines. I have sent back my Fitbit ionic and still have not received my discount code to buy a new one. I am so upset at your customer service people and am so tired of just trying to get my dumb discount code to buy a new watch that wont burn my wrist. Is this how this is supposed to go? Why won't you actually help your customers? Why do I have to be bounced around and spend 12+ hours of my life trying to fix your problem? I have been a loyal Fitbit user for 7 years, but I am strongly considering moving on to apple. I don't want to, because I have loved your products, but holy cow, this has been a nightmare. What can you do to help me get my discount code and keep me as a customer? -Jared Allsop

😡 2                                                2 Comments

Petz @Dpetzz · Apr 14                              •••
Replying to @parkjames
How about reimbursing people for the authentic **Fitbit** ionic accessories they purchased since you had to **recall** that dangerous and defective watch. These accessories don't work with any other **Fitbit** product so you basically have taken our money and screwed us over

– 24 –

CLASS ACTION COMPLAINT

1

2
**Bruce Vick** @BruceVick5 · Apr 14

3
@fitbit  Thanks for screwing over the people that waited for their refund for
the Ionic **recall** by limiting them to 1 ban, where as the people at the start of
4
the **recall** could get 5 bands.  Bad customer service all around in my opinion

5

6
**kenji griffen** @kenjicmt · Apr 17

@FitbitSupport WORST CUST 'SERV' EVER... on Ionic  #recall. 6+ weeks,
7
no refund, no disc code-yet they were very fast to disable my **fitbit**.
Deplorable
8

9
**Ian Christie** @IanChri47809496 · Apr 15

10
6 weeks has passed and no refund for the Ionic **recall**. Quick to disable the
device and render it useless but not quick to issue refund. Pathetic service.
11
**Fitbit** you need to sort this out and contact me.

12
**Petz** @Dpetzz · Apr 13

13
Replying to @fitbit

Terrible customer service regarding this **recall**. Cannot get an answer from
14
customer service and they refuse to provide a number to call the
department handling the **recall**.
15

16
Their forum most certainly is though, and
that's the team I am talking about.  There is
17
one asshat, E▓▓▓▓▓who has driven off a lot of

18
customers because he removed your post for
even minor criticism. He's also removed proof
19
of devices over heating and burns plus
batteries expanding and popping the screens
20
off.

21

22
**Eldis Skenderagic** @theeldis · 8h

23
A friendly reminder that it's been 58 days since @fitbit @FitbitSupport

announced Ionic **recall**/refund, and 58 days since thousands of people
24
around the world got their watches disabled, only to be left in dark with no
word from **Fitbit** or any sign of refund anywhere on horizon. 👌
25

26

27

28

GOOD GUSTAFSON AUMAIS LLP

CLASS ACTION COMPLAINT

80.   The problems described above still persist today. For example, all of these complaints are within the last 72 hours:

Entering week 8 now and being 6 months pregnant I'm finding this very stressful. Does anyone have any advice on how I can escalate this further please?

Fitbit where is my refund????? 8 weeks tomorrow. Your call centre hang up on me and are rude. You occasionally get a nice person who escalates your case, but no reply from fitbit. You can't help on any other means. I was a loyal customer for 6.5 years. I am so disappointed. Why are refunds being issued to people after a few weeks and us at 8 weeks are being left?

I am very disappointed with the total lack of support for the ionic recall. I registered on the 2nd March and despite Phone calls, Live Chats and Emails. I still have no discount code or refund. I have had to send invoices to prove I have a device!!!!
All I am told is that it is being passed to the technical team.
Has anyone else got these issues or been able to resolve them

11 hours ago

Fitbit are you going to make any comments about not refunding people at 8 weeks

Possibly the worst recall experience ever. I registered on the 3 march and only got my discount code now. Still waiting for this refund which is way out of the timeframe specified. It said 6 weeks and it has now been 8. have called multiple times and been advised that it's "coming" but they refuse to give a timeframe. Absolutely disgraceful service and someone actually closed a web chat on me cos they could not be bothered even answering any questions.

Hi, anyone having issues with the Ionic refund? Received an email with no links/code to use the funds. Every time I contact customer care, I am told 1) issue will be escalated, or 2) to wait for another email with a link/code, and on the last call 3) I was told to contact payments team, since there was an issue with the refund email. Not too sure which team to contact. It's been almost 2 months since I registered for the refund.



Racingmom5s

Recovery Runner
💬 11 ✔ 0 👍 0

3 hours ago                                                                 •••

I know the refund is real. My issue is the refund I was given is a virtual gift card. The virtual gift card doesn't work on Fitbit's site. I wasn't given an option of how to receive the payment, i.e, bank account,  PayPal, debit card. I was supposed to be given that option during registration but wasn't. The virtual card does not work on Fitbit's store. The Mastercard company told me it won't work because Fitbit isn't linked to the company. The Mastercard company sent me an email that lists the 109 retailers that will accept their card. None of the retailers sell Fitbit. So that's a problem. Fitbit stated in their email "the best way to purchase a replacement device is to use the refund at the Fitbit.com store". I would love to if it worked. I have it in writing from Fitbit now it's not being honored.Congratulations to those who have received a refund in their accounts or through PayPal. Hopefully Fitbit will realize soon that a huge error has been made on their part and fix the issue so I can replace my device on their store so I can get the 40% discount they promise using the refund. Or at this point they can send me a Sense with the free band. Sent from my Verizon, Samsung Galaxy smartphone

81.     Thus, as numerous Class Members have described herein, Defendant's recall fails to adequately address the Product Defect.

**F.     Defendant's Pre-Sale Knowledge of the Defect**

82.     Before the recall was issued, Defendant received reports of overheating and burning issues with the Products.

83.     The CPSC operates a website where consumers can post complaints about unsafe products and provide details about any incidents they experienced.

84.     Online safety reports to the CPSC show that Defendant, knew or should have known of the defect, yet it continued to sell the defective Products anyway.

85.     Per federal regulations, all safety reports that are submitted online through the CPSC website are sent directly to the product's manufacturer and retailers. Defendant also monitored safety complaints from the CPSC, and thus Defendant would have independently become aware of each safety report referenced herein separate and apart from noticed received from the CPSC.

86.     In total, Defendant received numerous reports of the Product overheating and burning users of the Product. This is an unusually high number of complaints for a product, and the unusually high number of complaints here put Defendant on notice of the Product Defect. The similarity of complaints also would have put Defendant on notice that the complaints were not the result of user error or anomalous incidents, but instead were the result of a systemic problem with the Product.

87.     Defendant not only was passively sent these complaints but also actively responded to consumers with boilerplate, standardized language that concealed the defect, and in many instances blamed the consumer by claiming that it wasn't a defect in the Product but rather a personal hygiene issue involving the customer.

88.     Every time the CPSC's website describes a consumer complaint, the website also discloses the date when CPSC sent that complaint to the manufacturer. This is separate from the portion of the safety complaint where the consumer states

GOOD GUSTAFSON AUMAIS LLP

whether he or she independently contacted the manufacturer. As alleged above, the above-referenced complaints were sent to Defendant by the CPSC shortly after being submitted to the CPSC.

89.     For each of the following reasons, Defendant's management knew or should have known about the complaints referenced above as soon as they began appearing on the CPSC website:

    **a.**   Defendant was repeatedly contacted directly by consumers and by the CPSC about the Product Defect.

    **b.**   The CPSC website is a government-run repository for complaints about safety-related defects, and many of Defendant's Products appear on the website. The CPSC website can provide businesses with early warnings of product defects, and monitoring reports is easy because users can search for reports by company names. Hence, it required negligible effort for Defendant's management and other personnel to visit the CPSC website and view a list of reports of safety incidents related to the Products, including reports about the Product Defect at issue here.

    **c.**   Defendant knows about the CPSC's website because it is a high-profile government agency that deals with complaints of numerous products manufactured, distributed, and sold by Defendant, and because Defendant would have been contacted directly each time a consumer complained to the CPSC.

    **d.**   Defendant also knew or should have known about the Defect because of the similarity of complaints. The fact that so many customers made similar complaints indicates that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the products at issue here. The reports and complaints from consumers also put Defendant on notice that the

GOOD GUSTAFSON AUMAIS LLP

Products were experiencing unusually high levels of complaints about the Product Defect at issue here, especially when compared to other smartwatches.

90. Defendant received numerous customer complaints before the named Plaintiffs purchased their Products.

91. Defendant responded to numerous customer complaints before the named Plaintiffs purchased their Products.

92. Defendant also would have had notice of the Product Defect as a result of direct customer complaints and product returns.

93. At a minimum, information from customer returns, complaints directly to Defendant, and information obtained from the CPSC, whether alone or in the aggregate, would have put Defendant on notice of the defect. Nonetheless, Defendant failed to recall any of the Products until March 2022, putting innumerable consumers at risk in the meantime.

94. Moreover, Defendant tried to present the Fitbit Ionic – a smartwatch that has not been manufactured since 2020 nor sold since December 2021 – as the scapegoat for all of the Products, and as a result, continues to expose innumerable consumers to the risks associated with the Defect.

**G. Defendant's Present Denial of the Defect**

95. Despite having knowledge of the Defect, up until March 2022, Defendant has denied the existence of the Defect.

96. Even then, it merely casts blame on a single long-discontinued model.

97. When consumers contact Defendant in an attempt to obtain a remedy, the Defendant continues the long-used Fitbit "hygiene" excuse that attempts to shift blame onto the consumer:

GOOD GUSTAFSON AUMAIS LLP

**a.**     In 2014:[32]



**January 14, 2014   (23 days)**

Comments from the Manufacturer/Private Labeler

A small percentage of Fitbit Force users have reported skin redness, swelling, itchiness or other skin irritations. Fitbit will offer an immediate refund directly to affected consumers for full retail price, or a replacement of a different Fitbit product and a refund of the price difference. For more information, please visit our FAQ at https://help.fitbit.com/customer/portal/articles/1425569 or contact force@fitbit.com.

**b.**     In 2015:[33]

Incident Details

Incident Description: I received a 2nd degree burn from a Fitbit surge. I have doctor documentation to support my claim. IF you need any more information plea contact me [REDACTED] [REDACTED]

Incident Date: 9/21/2015

Incident Location: Unspecified

Comments from the Manufacturer/Private Labeler

Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

**c.**     In 2016:[34]

Incident Details

Incident Description: This product caused a chemical burn on my wrists so badly it's now peeling. Some say it is a rash but rashes are not Burns. When someone saw they even asked me how I burned my wrist in the weird pattern that matched the wrist band. I contacted the company but have not heard back yet. There are already lawsuits existing over this issue.

Incident Date: 1/19/2016

Incident Location: Unspecified

Comments from the Manufacturer/Private Labeler

Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

---

[32] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20140123-0C6ED-2147447910 (Jan. 23, 2014), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1383464.

[33] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20150925-191ED-2147428066 (Sep. 25, 2015), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1519728.

[34] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20160122-39D00-2147424426 (Jan. 23, 2016), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1547805.

GOOD GUSTAFSON AUMAIS LLP

**d.** In 2017:[35]

**Incident Details**

Incident Description: Burn developed on my wrist as a result of wearing the Fitbit Charge HR.

Incident Date: 2/5/2017

Incident Location: Home/Apartment/Condominium

**Comments from the Manufacturer/Private Labeler**

Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

**e.** In 2018:[36]

**Incident Details**

Incident Description: I have had my wrists burned and scarred by two fit bit Charge HR products. I have reported this to the Fitbit Company. They refunded my money. I bought another. It worked as long as the previoua device and the. Burned my arm again. The user blog has over 165 entries from consumers who have been burned. Fitbit has not recalled the model. On the Fitbit site, search burn and Charge hr. It's all there. With pictures of injured consumers.

Incident Date: 2/8/2018

Incident Location: Home/Apartment/Condominium

**Comments from the Manufacturer/Private Labeler**

Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

**f.** In 2019:[37]

**Incident Details**

Incident Description: I was wakened in the middle of the night by the Charge 2 burning the back of my wrist.

Incident Date: 4/18/2019

Incident Location: Home/Apartment/Condominium

**Comments from the Manufacturer/Private Labeler**

Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

---

[35] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20170212-35CC3-2147407171 (Feb. 12, 2017), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1632711.

[36] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20180210-CC379-2147393004 (Feb. 10, 2018), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1734514.

[37] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20190426-E82B1-2147381368 (Apr. 26, 2019), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1866802.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

**g.**      In 2020:[38]

Incident Details

Incident Description: I received the product as a gift - and what a terrible gift to receive. After three weeks of use, I now have a burn the size of the back of the Fitbit on my wrist, which is now starting to peel and looks like it might leave a scar. The Fitbit remained clean, I did not sweat, and there are way TOO MANY reports on these products for Fitbit to continue to make excuses for a proven and consistent design flaw. A simple [REDACTED] search demonstrates that this burn / rash reaction quite clearly has been caused by several of various Fitbit models and injured way too many people. I am so disappointed with this company. It is absolutely beyond my comprehension how / why Fitbit is allowed to continue to market a product that has harmed countless end users. Shame on you, Fitbit.

Incident Date: 4/20/2020

Incident Location: Home/Apartment/Condominium

Comments from the Manufacturer/Private Labeler

Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

**h.**      In 2021:[39]

Incident Details

Incident Description: My Fitbit Inspire HR has now burned me twice. The first burn is still healing & the second burn yesterday caused bleeding.

Incident Date: 4/28/2021

Incident Location: Home/Apartment/Condominium

Comments from the Manufacturer/Private Labeler

Fitbit, Inc: Fitbit takes every complaint very seriously. Fitbit has contacted the customer directly to address this report. We encourage users to always follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. If users have questions, please contact us at support@fitbit.com.

**i.**      In 2022:[40]

Incident Details

Incident Description: My Fitbit Versa 3 burned my hand/wrist. The Versa 3 can be used to track sleep patterns, and I was wearing it to bed. The burn occurred while I was sleeping. I woke up in the morning and my skin hurt, I removed the watch and I had a red burnt area. The affected area coincided with the back of the watch face, where the light diodes flash. The picture I will attach I took about 4 days later when my skin started peeling off.

Incident Date: 2/23/2022

Incident Location: Home/Apartment/Condominium

Comments from the Manufacturer/Private Labeler

Fitbit, Inc: Fitbit is aware that skin irritation affects a very limited number of consumers who use wearable devices all day and all night from sweat, water, or soap being held against the skin under the device, or from pressure or friction against the skin. We encourage users to follow our wear and care instructions, available at www.fitbit.com/productcare. If any users are experiencing skin irritation we encourage them to remove the device to give their wrist a rest. If symptoms persist longer than 2-3 days after removing the device, users should contact a dermatologist/their doctor. Fitbit takes every complaint very seriously. If you have provided contact information, a Customer Support agent will contact you within 7 days. Otherwise please contact us at support@fitbit.com.

---

[38] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20200428-BC67C-2147372667 (April. 28, 2020), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1975780.

[39] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20210429-A7930-2147364422 (April 29, 2021), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3239980.

[40] U.S. CONSUMER PRODUCT SAFETY COMMISSION, Report # 20220311-F1E3F-2147357272 (Mar. 11, 2022), https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3625082.

CLASS ACTION COMPLAINT

1    98.    This denial and shifting blame to harmed consumers is ever present in

2  Defendant's responses to the burn injuries caused by its Products:



Absolutely! I felt like I was going crazy after getting burned MULTIPLE TIMES and going to the
forums to find answers, only for the support team to just answer other concerned users with "oh
it's just a rash because you haven't kept it clean," which is kinda insulting.

19    99.    As shown above, the response involves slight variations on the same

20  theme. Despite, "a very limited number of consumers" being impacted by a problem

21  that can be solved by better hygiene, the company's advice has failed to stop the flood

22  of consumers that are burned by the Products.

23    100.    Simply, same problem, same response, and same outcome: continued

24  denial by the company which exposes consumers to undue risks from the hidden

25  Defect.

GOOD GUSTAFSON AUMAIS LLP

**H.      Plaintiffs and Class Members Have Suffered Economic Injury**

101.    Plaintiffs and the Class Members reasonably relied to their detriment on Defendant's deceptive and misleading representations and omissions concerning the Products and the "recall."

102.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiffs and the Class Members.

103.    In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products under the – false – belief that the Products were safe and free of the Defect.

104.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured the Plaintiffs and the Class Members in that they:

    a.  Paid a sum of money for Products that were not what Defendant represented;

    b.  Paid a premium price for Products that were not what Defendant represented;

    c.  Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

    d.  Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

105.    Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiffs and the Class Members would not have been willing to purchase the Products.

GOOD GUSTAFSON AUMAIS LLP

106.    Plaintiffs and the Class Members paid for Products that were believed to be safe and free of the Defect but received Products that were unsafe and contained the Defect. The products Plaintiffs and the Class Members received were worth less than the Products for which they paid.

107.    Plaintiffs and the Class Members all paid money for the Products. However, Plaintiffs and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiffs and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiffs and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

108.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the presence of the Defect in the Products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived regarding the Products and could not reasonably discover that they suffered the Defect.

109.    Plaintiffs and Class Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the presence of the Defect in the Products. As alleged herein, the presence of the Defect was material to Plaintiffs and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiffs and Members of the Class would not have discovered through the existence of reasonable diligence that the Products contained the Defect.

110.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and the Class the true standard, quality, and grade of the Products and to disclose the presence of the Defect due to its exclusive and superior knowledge of the

GOOD GUSTAFSON AUMAIS LLP

contents, materials, and engineering for the Products. Additionally, the Defendant has exclusive and superior knowledge concerning the scale of the Defect, the number of people harmed by the Defect, and the presence of the Defect in all of its Products.

111.    Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and Class Members reasonably relied on Defendant's knowing, active, and affirmative concealment.

112.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statues of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves, on behalf of all others similarly situated, and as a member of the Classes defined as follows (collectively, the "Classes" or "Class"):

   a.    Multi-State Consumer Class: All persons in the States of California, Florida, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, Pennsylvania, Oregon, and Washington who purchased the Products.[41]

---

[41] The States in the Multi-State Consumer Class are limited to those States with similar consumer protection laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. 407.010, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); Pennsylvania (73 Pa. Stat. Ann. §§ 201-1 et seq.); Oregon (Or. Rev. Stat. §§ 646.605, et seq.); and Washington (Wash Rev. Code § 19.86.010, et seq).

**GOOD GUSTAFSON AUMAIS LLP**

**b.** California Class: All persons who purchased Defendant's Product within the State of California and within the applicable statute of limitations.

**c.** Pennsylvania Class: All persons who purchased Defendant's Product within the Commonwealth of Pennsylvania and within the applicable statute of limitations.

**d.** Nationwide Class: All persons who purchased Defendant's Product within the United States and within the applicable statute of limitations period.

114. Excluded from the Class are Defendant, their parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom the case is assigned and any immediate family members thereof.

115. The members of the Class are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, millions of units of the Products to Class Members.

116. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

**a.** whether Defendant misrepresented material facts concerning the Products on the label of every product;

**b.** whether Defendant's conduct was unfair, misleading, and/or deceptive;

**GOOD GUSTAFSON AUMAIS LLP**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    **c.**    whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Classes;

    **d.**    whether Plaintiffs and the Classes are entitled to equitable and/or injunctive relief;

    **e.**    whether Defendant breached warranties to Plaintiffs and the Classes;

    **f.**    whether Plaintiffs and the Classes have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

117.   Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like all members of the Classes, purchased Defendant's Products containing the same Defect, and suffering from the same representations and omissions, and Plaintiffs sustained damages from Defendant's wrongful conduct.

118.   Plaintiffs will fairly and adequately protect the interests of the classes and have retained counsel that is experienced in litigating complex class actions. Plaintiffs have no interests which conflict with those of the classes.

119.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to

individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

120.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

121.    The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

122.    For the purposes of this Complaint, the term "Class Members" refers to all members of the Class, including the Plaintiffs.

123.    This action is maintainable as a class action under Federal Rule of Civil Procedure Rule 23.

124.    This Court should certify a class under Rule 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the Class, by making illegal, unfair, misleading and deceptive representations and omissions regarding Products.

125.    This Court should certify a class under Rule 23(b)(3) because the common issues identified above predominate over any questions affecting individual members and a class is superior to other available methods to fairly and efficiently adjudicate the claims.

126.    **Notice to the Class**.  Plaintiffs anticipate that this Court can direct notice to the Class, to be effectuated by publication in major media outlets and the Internet.

## COUNT I

### Violation of State Consumer Protection Statutes
(On Behalf of the Multi-State Consumer Class)

127.    Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

128.    The Consumer Protection Acts of the States in the Multi-State Consumer Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

129.    Defendant intended that Plaintiffs and the other members of the Multi-State Consumer Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

130.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs, and other members of Multi-State Consumer Class, have sustained damages in an amount to be proven at trial.

## COUNT II

**Violation of California Business & Professions Code §§ 17200 *et seq.* –**
**Unlawful Conduct Prong of the UCL**

(On Behalf of the Nationwide Class)

131.    Plaintiffs  incorporate by reference all allegations contained in the complaint as if fully set forth herein.

132.    The acts, omissions, misrepresentations and practices of Defendant constitute "unlawful" business acts and practices under the California Business & Professions Code section 17200 ("UCL").

133.    Defendant's acts, omissions, misrepresentations and practices are "unlawful" because they violate the California False Advertising Law ("FAL"), the Magnuson-Moss Warranty Act ("MMWA") and the Consumer Legal Remedies Act ("CLRA").

134.    Defendant's representations and omissions that the Products are adequate and safe are false, deceptive, and likely to deceive the public.

135.    Defendant's deceptive advertising caused Plaintiffs  and members of the Class to suffer injury in fact and to lose money or property, as it denied them the benefit of the bargain when they decided to make their purchases over other products that are less expensive and without the harmful and dangerous effects of the Products.

136.    In accordance with California Business & Professions Code section 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unfair acts and practices and to commence a corrective advertising campaign.

137.    Plaintiffs also seek an order for the disgorgement and restitution of all monies from the sale of the Products that were unjustly acquired through acts of unlawful, unfair and/or fraudulent competition.

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4

**COUNT III**

**Violation of California Business & Professions Code §§ 17200, *et seq.* –**
**Unfair and Fraudulent Conduct Prongs of the UCL**
<u>(On Behalf of the Nationwide Class)</u>

5
6

138.    Plaintiffs incorporate by reference all the allegations of the preceding paragraphs.

7
8

139.    California Business & Professions Code section 17200 prohibits any unfair or fraudulent business act or practice.

9
10
11

140.    The false and misleading marketing, advertising, and labeling of the Products, as alleged herein, constitute unfair business acts and practices because such conduct is immoral, unscrupulous, and offends public policy.

12
13
14

141.    The acts, omissions, misrepresentations, practices, and non-disclosures constitute "fraudulent" business acts and practices, because Defendant's conduct is false and misleading to Plaintiffs and Class Members.

15
16

142.    Further, the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct.

17
18

143.    Defendant's advertising, communications, packaging, and marketing of the Products is likely to deceive Class Members about their safety.

19
20
21

144.    Defendant either knew or reasonably should have known that the claims and statements in the advertising, marketing, and labeling were likely to deceive consumers.

22
23
24
25

145.    In accordance with California Business & Professions Code section 17203, Plaintiffs  seek an order enjoining Defendant from continuing to conduct business through unfair and/or fraudulent acts and practices and to commence a corrective advertising campaign.

26
27
28

146.    Plaintiffs seek an order for the disgorgement and restitution of all monies from the sale of the smartwatches that were unjustly acquired through acts of unlawful, unfair and/or fraudulent competition.

GOOD GUSTAFSON AUMAIS LLP

**COUNT IV**

**Violation of California Business & Professions Code §§ 17500, *et seq.* –**
**False and Misleading Advertising**

(On Behalf of the Nationwide Class)

147.    Plaintiff incorporates by reference all preceding paragraphs.

148.    California False Advertising Law (Cal. Business & Professions Code sections 17500 and 17508) prohibits "mak[ing] any false or misleading advertising claim."

149.    Google, in its advertising, marketing, and labeling of the Products, makes false and misleading advertising claims as it deceives consumers as to their safety.

150.    In reliance on these false and misleading advertising claims, Plaintiffs and members of the Nationwide Class purchased and used the smartwatches without the knowledge they caused, or greatly increased the risk of, serious injury or death, to users of the Products.

151.    Defendant knew or should have known that its labeling, advertising, and marketing was likely to deceive consumers.

152.    As a result, Plaintiffs and the Class are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Google was unjustly enriched.

**COUNT V**

**Violation of California's Consumers Legal Remedies Act**
**CAL. CIV. CODE § 1750 et seq.**

(Seeking Injunctive Relief Only)

(In the Alternative to Count I and on Behalf of the California Class)

153.    Plaintiff Ramirez incorporates by reference and re-alleges herein all paragraphs alleged above.

GOOD GUSTAFSON AUMAIS LLP

154. Plaintiff Ramirez brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

155. This claim seeks injunctive relief only, pursuant to California Civil Code section 1782(d).

156. Defendant's actions, representations, and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or that have resulted, in the sale of goods to consumers.

157. Plaintiff Ramirez and the California Class members are "consumers" as the CLRA defines that term in California Civil Code section 1761(d).

158. Defendant sold the Products, which are "goods" within the meaning of California Civil Code section 1761(a), to Plaintiff Ramirez and the California Class members.

159. Defendant's policies, acts, and practices were designed to, and did, result in Plaintiff Ramirez and the California Class members' purchase and use of the Products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the California Civil Code section 1770:

    **a.** section 1770(a)(5), which prohibits representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

    **b.** section 1770(a)(7), which prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    **c.** section 1770(a)(9), which prohibits advertising goods or services with intent not to sell them as advertised; and

    **d.** section 1770(a)(16), which prohibits representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

160.    Defendant's advertising, labeling, and marketing of the Products are likely to deceive reasonable consumers, including Plaintiff Ramirez and the California Class members. Defendant's representations and omissions that the Products are adequate and safe are false and likely to deceive the public, as is Defendant's failure to mention the numerous adverse events related to their usage.

161.    Plaintiff Ramirez and the California Class members would not have purchased the Products absent Defendant's misleading and deceptive marketing campaign and labeling regarding the safety of the Products.

162.    Google knew or should have known that its Products' advertising, labeling, and marketing were likely to deceive reasonable consumers regarding the safety of the Products.

163.    Google's deceptive representations and omissions about the Products caused Plaintiff Ramirez and the members of the California Class to suffer injury in fact and to lose money or property, as it denied them the benefit of the bargain when they decided to make their Product purchases over other products that are less expensive and without the harmful and dangerous effects of the Products.

164.    Plaintiff Ramirez and the California Class members request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code section 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff Ramirez and the California Class members will be harmed in that they will continue to be unable to rely on Defendant's deceptive representations and omissions regarding the safety of the Products.

165.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff Ramirez provided notice to Defendant of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on April 18, 2022. As of the date of filing this complaint, Defendant has not responded.

Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

## COUNT VI

### Violation of Pennsylvania Unfair Trade Practices and
### Consumer Protection Law (UTPCPL)
### 73 P.S. § 201 *et seq.*

(In the Alternative to Count I and on Behalf of the Pennsylvania Class)

166.    Plaintiff Houtchens incorporates by reference and re-alleges herein all paragraphs alleged above.

167.    Plaintiff Houtchens incorporates by reference all allegations contained in the complaint as if fully set forth herein.

168.    Defendant is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

169.    Plaintiff Houtchens and Pennsylvania Class Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

170.    As alleged more fully above, Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following:

      **a.**     representing that its goods and services have characteristics, uses, benefits, and qualities they do not have (73 Pa. Cons. Stat. § 201-2(4)(v));

**b.** representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(v)(vii));

**c.** advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)); and

**d.** engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 Pa. Cons. Stat. § 201-2(v)(xxi)).

171. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

172. As alleged more fully above, the representations and omissions regarding the safety of the Products were misleading.

173. Plaintiff Houtchens and members of the Pennsylvania class relied upon them in purchasing the Products.

174. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Houtchens and the Pennsylvania Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

175. Plaintiff Houtchens and other members of the Pennsylvania Class lost money or property as a result of Defendant's violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were unsafe;  (b) they paid a substantial price premium compared to other products due to

GOOD GUSTAFSON AUMAIS LLP

Defendant's misrepresentations and omissions; and (c) the Products do not have the quality, characteristics, uses, or benefits as promised.

176.    Plaintiff Houtchens and the Pennsylvania Class seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

## COUNT VII

### Breach of Implied Warranty

(On Behalf of the Nationwide Class)

177.    Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

178.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

179.    Defendant, as the marketer, distributor, and/or seller of the Products, impliedly warranted that the Products (i) would not contain a safety-related defect and (ii) was generally safe for consumer use.

180.    Defendant breached the warranty implied in the contract for the sale of the defective Products because it could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for its intended and ordinary purpose because the Products were defective in that it contained a defect that made the Products unreasonably dangerous, and as such is not generally recognized as safe for consumer use. As a result, Plaintiffs and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

181.    In addition, Plaintiffs and Class Members were harmed because the Products failed almost immediately after Plaintiffs and Class Members purchased the product, a period far shorter than the implied warranty.

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

182.    Defendant was on notice of the Defect because it has exclusive knowledge.

183.    Defendant was also on notice of the Defect because of numerous complaints filed with the federal government and distributed to Defendant.

184.    Additionally, Plaintiffs each sent notice of these breaches via US Postal service.

185.    Plaintiffs and Class Members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

186.    The Products were not altered by Plaintiff or Class Members.

187.    The Products were defective when it left the exclusive control of Defendant.

188.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

189.    The Products were defectively manufactured and unfit for their intended purpose, and Plaintiffs and Class Members did not receive the goods as warranted.

190.    Privity is not required as to Defendant because the Products contained a dangerous design defect (i.e., the ability of the Product to overheat and pose a hazard to users). As the known end purchaser, Plaintiffs is also a third-party beneficiary of the implied warranty of merchantability.

191.    Defendant's attempts to disclaim or limit the implied warranty of merchantability vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the defects.

192.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and the Class Members. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class Members,

as only Defendant knew or should have known that the Products were defective at the time of sale and that the devices were not of merchantable quality.

193.    Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

194.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class Members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained the defect, making it unsafe for consumer use; and (b) the Products does not have the characteristics, uses, or benefits as promised by Defendant.

## COUNT VIII

### Violation Of The Magnuson-Moss Warranty Act,

### 15 U.S.C. §§ 2301, et seq

(On Behalf of the Nationwide Class)

195.    Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

196.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

197.    The Products are consumer products as defined in 15 U.S.C. § 2301.

198.    Plaintiffs and the Class Members are consumers as defined in 15 U.S.C. § 2301.

199.    Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301.

200.    In connection with the marketing and sale of the Products, Defendant impliedly warranted that the Products was fit for use as a smartwatch. The Products were not fit for use as a smartwatch due to the defect described in the allegations above.

201.    By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiffs and the Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq., thereby damaging Plaintiffs and the Class Members.

202.    Plaintiffs and the Class Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they knew the truth about the defective nature of the Products.

203.    Despite notice by Plaintiffs and the Class Members to Defendant of the defective nature of the Products, Defendant did not replace or repair the defective Products. Instead, the costs of the defects were borne by consumers.

204.    As a direct and proximate result of Defendant's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and Class Members have suffered damages in an amount to be proven at trial.

205.    The amount in controversy for the Plaintiffs' and Class Members' individual claims meets or exceeds the sum of $25. The total amount in controversy of this action in sum exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

206.    Plaintiffs and Class Members are entitled to recover damages as a result of Defendant's breach of warranties.

207.    Plaintiffs and Class Members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

## COUNT IX

### Unjust Enrichment

#### (On Behalf of the Nationwide Class)

208.    Plaintiffs incorporate by reference and re-alleges herein all paragraphs alleged above.

209.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

210.    "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's law are two fundamental elements—the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

211.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiffs and the Classes.

212.    The Products purchased by Plaintiffs and the Class Members did not provide the promised performance and instead contained uniform defects.

213.    Plaintiffs and Class Members conferred a benefit on Defendant by purchasing the Products and by paying a price premium for them.

214.    Defendant has knowledge of such benefits.

215.    Defendant has been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Product, which retention under these circumstances is unjust and inequitable because Defendant misrepresented that the Product (i) would not contain a dangerous defect and (ii) is generally recognized as safe for use as a smartwatch. This misrepresentation caused injuries to Plaintiffs and

Class Members because they would not have purchased the Products if the true facts regarding the Products were known.

216.   Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class Members for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and other members of the proposed Class herein, prays for judgment and relief on all of the legal claims as follows:

A.   Certification of the Class, certifying Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel for the Class;

B.   A declaration that Defendant has committed the violations alleged herein;

C.   A declaration that Defendant has committed that Defendant's actions are fraudulent, deceptive, and misleading as alleged herein;

D.   For restitution and disgorgement pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and Cal Civ. Code § 1780;

E.   For declaratory and injunctive relief pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*;

F.   An award of compensatory damages, the amount of which is to be determined at trial;

G.   For punitive damages;

H.   For interest at the legal rate on the foregoing sums;

I.   For statutory damages;

J.   For attorneys' fees;

GOOD GUSTAFSON AUMAIS LLP

K.      For costs of suit incurred; and

L.      For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all causes of action so triable.

Dated: April 29, 2022

**Good Gustafson Aumais LLP**

/s/    *Christopher T. Aumais*
Christopher T. Aumais (Cal. Bar No. 249901)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
cta@ggallp.com


**THE SMITH LAW FIRM, PLLC**
R. ALLEN SMITH, Esq.*
asmith@smith-law.org
300 Concourse Blvd., Suite 104
Ridgeland, MS 39157
Tel:  (601) 952-1422
Fax: (601) 952-1426


**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT